T.C. Memo. 2007-26

UNITED STATES TAX COURT

FRANKLIN AND JANETTA HUBBART, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18722-04L.            Filed February 6, 2007.

<u>Jaret R. Coles</u> and <u>Terri A. Merriam</u>, for petitioners.

<u>Gregory M. Hahn</u> and <u>Thomas N. Tomashek</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Petitioners filed a petition with this Court in response to a Notice of Determination Concerning Collection Actions Under Section 6320 (notice of determination) for 1981 through 1986.[1]  Pursuant to section 6330(d), petitioners seek

_____

[1]  Unless otherwise indicated, all section references are to
(continued...)

review of respondent's determination.  The issue for decision is
whether respondent abused his discretion in sustaining the
proposed collection action.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The first, second, third, fourth, and fifth stipulations of fact
and the attached exhibits are incorporated herein by this
reference.[3]

---

[1](...continued)
the Internal Revenue Code, as amended, and all Rule references
are to the Tax Court Rules of Practice and Procedure.  Amounts
are rounded to the nearest dollar.

[2]  Petitioners also dispute respondent's determination that
they are liable for the increased rate of interest on tax-
motivated transactions under sec. 6621(c), I.R.C. 1986.  As to
this dispute, the parties filed a stipulation to be bound by the
Court's determination in Ertz v. Commissioner, T.C. Memo. 2007-
15, which involves a similar issue.

[3]  Respondent reserved relevancy objections to many of the
exhibits attached to the stipulations of fact.  Fed. R. Evid. 402
provides the general rule that all relevant evidence is
admissible, while evidence which is not relevant is not
admissible.  Fed. R. Evid. 401 defines relevant evidence as
"evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence."
While the relevance of some exhibits is certainly limited, we
find that the exhibits meet the threshold definition of relevant
evidence and are admissible.  The Court will give the exhibits
only such consideration as is warranted by their pertinence to
the Court's analysis of petitioners' case.

Respondent also objected to many of the exhibits on the
basis of hearsay.  Even if we were to receive those exhibits into
evidence, they would have no impact on our findings of fact or on
the outcome of this case.

Petitioners resided in Valley Springs, California, when they filed their petition. Petitioners have been married for 37 years. At the time of trial, petitioner Franklin Hubbart (Mr. Hubbart) was 66 years old, and petitioner Janetta Hubbart (Mrs. Hubbart) was 64. Mr. Hubbart retired in 2001, and Mrs. Hubbart retired in 2000.

In 1984, petitioners became partners in Shorthorn Genetic Engineering, Ltd. 1984-3 (SGE 84-3), a cattle breeding partnership organized and operated by Walter J. Hoyt III (Hoyt).[4]

From about 1971 through 1998, Hoyt organized, promoted, and operated more than 100 cattle breeding partnerships. Hoyt also organized, promoted, and operated sheep breeding partnerships. From 1983 to his subsequent removal by the Tax Court in 2000 through 2003, Hoyt was the tax matters partner of each Hoyt partnership. From approximately 1980 through 1997, Hoyt was a licensed enrolled agent, and as such, he represented many of the Hoyt partners before the Internal Revenue Service (IRS). In

---

[4] Petitioners were also partners in another Hoyt-related partnership identified as Hoyt and Sons Trucking (HS Truck). The details of HS Truck are not in the record. Though unclear, it appears that all adjustments made to petitioners' income tax liability for the years in issue arose from their involvement in SGE 84-3 only.

1998, Hoyt's enrolled agent status was revoked. Hoyt was convicted of various criminal charges in 2000.[5]

Beginning in 1984 until at least 1986, petitioners claimed losses and credits on their Federal income tax returns arising from their involvement in the Hoyt partnerships. Petitioners also carried back unused investment credits to 1981, 1982, and 1983. As a result of these losses and credits, petitioners reported overpayments of tax for 1981 through 1986 and received refunds in the amounts claimed.

---

[5] Petitioners ask the Court to take judicial notice of certain "facts" in other Hoyt-related cases and apply judicial estoppel to "facts respondent has asserted in previous [Hoyt-related] litigation". We do neither.

A judicially noticeable fact is one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Petitioners are not asking the Court to take judicial notice of facts that are not subject to reasonable dispute. Instead, petitioners are asking the Court to take judicial notice of the truth of assertions made by taxpayers and the Commissioner in other Hoyt-related cases. Such assertions are not the proper subject of judicial notice.

The doctrine of judicial estoppel prevents a party from asserting in a legal proceeding a claim that is inconsistent with a position successfully taken by that party in a previous proceeding. New Hampshire v. Maine, 532 U.S. 742, 749 (2001). Among the requirements for judicial estoppel to be invoked, a party's current litigating position must be "clearly inconsistent" with a prior litigating position. Id. at 750-751. Petitioners have failed to identify any clear inconsistencies between respondent's current position and his position in any previous litigation.

Respondent issued notices of final partnership administrative adjustments (FPAAs) to SGE 84-3 for its 1984 through 1986 taxable years.[6]  After completion of the partnership-level proceedings, respondent sent petitioners a Form 4549A-CG, Income Tax Examination Changes, reflecting changes made for petitioners' 1981 through 1986 tax years.  Respondent determined deficiencies in petitioners' income tax of $10,731, $7,001, $5,552, $2,641, $5,463, and $5,268, respectively.

On November 22, 2001, respondent issued petitioners a Notice of Federal Tax Lien and Your Right to a Hearing Under IRC 6320 (notice of lien).  The notice of lien informed petitioners that a Federal tax lien had been filed to secure payment of their outstanding tax liabilities for 1981 through 1986.

On December 21, 2001, petitioners submitted a Form 12153, Request for a Collection Due Process Hearing.  Petitioners argued that the Federal tax lien was inappropriate and caused them financial hardship.

On October 31, 2003, petitioners' case was assigned to Settlement Officer Linda Cochran (Ms. Cochran).  Ms. Cochran scheduled petitioners' section 6330 hearing for March 23, 2004.  During the hearing, petitioners' representative, Terri A. Merriam (Ms. Merriam), requested additional time to submit information.

_____

[6]  The FPAAs and other information specific to SGE 84-3's partnership-level proceedings are not in the record.

While Ms. Cochran normally required documents to be submitted before the section 6330 hearing, she extended petitioner's deadline for producing information to April 9, 2004.

On April 9, 2004, petitioners submitted to Ms. Cochran a Form 656, Offer in Compromise, a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, one letter explaining the offer amount and other payment considerations, and three letters setting out in detail petitioners' position regarding the offer-in-compromise. Petitioners' letters included several exhibits.

The Form 656 indicated that petitioners were seeking an offer-in-compromise based alternatively on doubt as to collectibility with special circumstances or effective tax administration. Petitioners offered to pay $60,400 to compromise their outstanding tax liability for 1981 through 1996. At the time of the section 6330 hearing, $345,145 had been assessed against petitioners with respect to their 1981 through 1996 tax years.

On the Form 433-A, petitioners listed the following assets:

| Asset | Current Balance/Value | Loan Balance |
|-------|----------------------|--------------|
| Checking accounts | $9,876 | n/a |
| Savings accounts | 525 | n/a |
| Life insurance | 1,174 | $9,900 |
| 2002 Ford F350 | 9,195 | 36,687 |
| 1989 Nissan Maxima | 538 | -0- |
| 5th Wheel Camper | -0- | -0- |
| Boat & Trailer | 11,000 | -0- |
| House | 164,713 | -0- |
| Total | 197,021 | 46,587 |

The reported value of the life insurance reflected its then-current cash value.  The reported value of the house reflected both the value of the land ($11,313) and the value of the house ($154,400).

Petitioners reported gross monthly income of $7,263, representing Mr. Hubbart's pension/Social Security income of $3,381, and Mrs. Hubbart's pension/Social Security income of $3,882.  Petitioners also reported the following monthly living expenses:

| Expense item | Monthly expense |
|---|---|
| Food, clothing, misc. | $2,011 |
| Housing and utilities | 1,156 |
| Transportation | 1,212 |
| Health care | 1,130 |
| Taxes (income and FICA) | 817 |
| Court ordered payments | 364 |
| Life insurance | 100 |
| Other expenses | 429 |
| Total | 7,219 |

The transportation expense included the cost of gas to and from Mr. Hubbart's medical treatments, described below. The court-ordered payments represented an installment agreement with the State of California Franchise Tax Board to resolve petitioners' outstanding State tax liabilities. The other expenses represented attorney's fees petitioners paid to Ms. Merriam's law firm in connection with the present litigation.

In the letter explaining the offer amount, petitioners stated that they were offering to pay $60,400:

> for all Hoyt-related years, 1981 through 1996, to be paid in ninety days from the acceptance of the offer. * * * We have attached an estimate [of the tax due] * * * It does not include any penalties, including the tax motivated transaction interest penalty or failure to pay penalty.

The letter also included "medical and retirement considerations" and a "retirement analysis". Petitioners' medical and retirement considerations included: (1) Petitioners were retired; (2) Mrs.

Hubbart had a history of ulcerative colitis, and has to have a colonoscopy each year, for which she has to pay $1,000; and (3) Mr. Hubbart suffered from heart problems, had an angioplasty and an angiogram during 2004, required 35 sessions of a treatment called External Counterpulsion System beginning April 19 and ending June 4, 2004, and would likely require heart bypass surgery in the future. The retirement analysis outlined the likelihood of increased housing and medical costs as petitioners age.

In the remaining three letters, petitioners alleged that they were victims of Hoyt's fraud and asserted various arguments regarding the appropriateness of an offer-in-compromise.

On May 21, 2004, petitioners submitted another letter to Ms. Cochran, which included 42 exhibits not provided with the April 9, 2004, letters.

On September 1, 2004, respondent issued petitioners a notice of determination. In evaluating petitioners' offer-in-compromise, respondent made the following changes to the values of assets reported by petitioners on the Form 433-A: (1) Determined that the house was worth $214,141 instead of $164,713, based on the value assigned to the property by the Calaveras County Assessor's Office in 2002; (2) included the quick-sale value of the 1989 Nissan Maxima of $431 instead of the fair market value petitioners reported; (3) included the quick-sale

value of the boat and carrier of $8,800 instead of the fair market value petitioners reported; and (4) estimated that the quick-sale value of the fifth wheel camper was $400. Respondent did not include the value of the life insurance or the 2002 Ford F350 because the loans on the items exceeded their value. Respondent concluded that petitioners had a total net realizable equity of $234,172.

Respondent accepted petitioners' reported gross monthly income of $7,219. Respondent made the following adjustments to petitioners' monthly expenses: (1) Reduced the housing and utilities expense from $1,156 to $726 to reflect the actual documented costs; (2) reduced the transportation expense from $1,212 to $758 because Mr. Hubbart's medical treatments were completed by the time of the section 6330 hearing and thus an additional allowance for gas was not needed; (3) reduced medical expenses from $1,130 to $912 to reflect actual documented out-of-pocket expenses; and (4) allowed the payments to the State of California Franchise Tax Board only through July 2007 because petitioners estimated that their State tax liability would be paid by that time. Regarding the possible future increases in expenses outlined in petitioners' April 9, 2004 letters, respondent determined that these were "general projections from the taxpayers' representative and may never, in fact, be incurred" and thus did not take them into account.

After making adjustments to petitioners' monthly expenses, respondent determined that $145,222 was collectible from petitioners' future income.[7]  Because petitioners' State tax debt would be satisfied by July 2007, respondent determined that there was an "amount collectible from retired debt" over the period remaining on the collection statute of $14,924.  Respondent concluded that petitioners had a reasonable collection potential of $394,318.

Because petitioners had the ability to pay substantially more than the amount offered, respondent rejected their offer-in-compromise based on doubt as to collectibility with special circumstances.  Respondent also rejected their effective tax administration offer-in-compromise based on economic hardship because they had the ability to pay their tax liability in full.  Finally, respondent rejected their effective tax administration offer-in-compromise based on public policy or equity ground because the case "fails to meet the criteria for such consideration".

Respondent concluded that petitioners did not offer an acceptable collection alternative, that all requirements of law and administrative procedure had been met, and that the Federal tax lien represented the most efficient means to protect the

---

[7]  Respondent determined that petitioners had monthly disposable income of $1,886 and multiplied this by 77, the number of months remaining on the collection statute.

Government's interest in petitioners' assets until their outstanding tax liabilities are satisfied.

In response to the notice of determination, petitioners filed a petition with this Court on October 4, 2004.

OPINION

Section 7122(a) provides that "The Secretary may compromise any civil * * * case arising under the internal revenue laws". Whether to accept an offer-in-compromise is left to the Secretary's discretion. Fargo v. Commissioner, 447 F.3d 706, 712 (9th Cir. 2006), affg. T.C. Memo. 2004-13; sec. 301.7122-1(c)(1), Proced. & Admin. Regs.

The regulations under section 7122(a) set forth three grounds for the compromise of a tax liability: (1) Doubt as to liability; (2) doubt as to collectibility; or (3) promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Doubt as to liability is not at issue in this case.[8]

The Secretary may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the assessed liability. Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. Generally, under the Commissioner's administrative pronouncements, an offer-in-

---

[8] While petitioners disputed their liability for sec. 6621(c) interest, see supra note 2, they did not raise doubt as to liability as a grounds for compromise.

compromise based on doubt as to collectibility will be acceptable only if it reflects the taxpayer's reasonable collection potential.  Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.  In some cases, the Commissioner will accept an offer of less than the reasonable collection potential if there are "special circumstances".  Id.  Special circumstances are:  (1) Circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the reasonable collection potential; or (2) circumstances justifying acceptance of an amount less than the reasonable collection potential of the case based on public policy or equity considerations.  See Internal Revenue Manual (IRM) sec. 5.6.4.3(4).  However, in accordance with the Commissioner's guidelines, an offer-in-compromise based on doubt as to collectibility with special circumstances should not be accepted, even when economic hardship or considerations of public policy or equity circumstances are identified, if the taxpayer does not offer an acceptable amount.  See IRM sec. 5.8.11.2.1(11) and .2(12).

The Secretary may also compromise a tax liability on the ground of effective tax administration when:  (1) Collection of the full liability will create economic hardship; or (2) exceptional circumstances exist such that collection of the full liability would undermine public confidence that the tax laws are

being administered in a fair and equitable manner; and (3) compromise of the liability would not undermine compliance by taxpayers with the tax laws.  Sec. 301.7122-1(b)(3), Proced. & Admin. Regs.

Petitioners proposed an offer-in-compromise based alternatively on doubt as to collectibility with special circumstances or effective tax administration.  Petitioners offered to pay $60,400 to compromise their outstanding tax liability for 1981 through 1996, which totaled $345,145 at the time of the section 6330 hearing.[9]  Petitioners argued that collection of the full liability would create economic hardship and would undermine public confidence that the tax laws are being administered in a fair and equitable manner.  Respondent determined that petitioners' reasonable collection potential was $394,318 and that their offer-in-compromise did not meet the criteria for an offer-in-compromise based on either doubt as to collectibility with special circumstances or effective tax administration.

---

[9] The Federal tax lien was filed to secure repayment of petitioners' outstanding tax liability for 1981-86 only. Petitioners estimated that their outstanding tax liability for 1981-86 was $257,012.  However, petitioners sought to compromise their outstanding tax liability for not only 1981-86, but also for 1987-96.  To accurately compare their offer amount to their outstanding tax liability, we must therefore consider the total assessed amount for 1981-96, and not for only 1981-86.

Because the underlying tax liability is not at issue, our review under section 6330 is for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000). This standard does not ask us to decide whether in our own opinion petitioners' offer-in-compromise should have been accepted, but whether respondent's rejection of the offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Keller v. Commissioner, T.C. Memo. 2006-166; Fowler v. Commissioner, T.C. Memo. 2004-163. Because the same factors are taken into account in evaluating offers-in-compromise based on doubt as to collectibility with special circumstances and on effective tax administration (economic hardship or considerations of public policy or equity), we consider petitioners' separate grounds for their offer-in-compromise together. See Murphy v. Commissioner, 125 T.C. 301, 309, 320 n.10 (2005), affd. 469 F.3d 27 (1st Cir. 2006); Barnes v. Commissioner, T.C. Memo. 2006-150.

A.   Economic Hardship

Petitioners assert that Ms. Cochran abused her discretion by rejecting their offer-in-compromise because "There is no indication that SO Cochran gave any substantive consideration to Petitioners' demonstrated special circumstances or that they would experience a hardship if required to make a full-payment."

In support of this assertion, petitioners argue:  (1) Ms. Cochran failed to discuss petitioners' special circumstances in the notice of determination; and (2) Ms. Cochran erroneously determined petitioners' future income, improperly valued petitioners' assets, and failed to take into account their future expenses.

Section 301.6343-1(b)(4)(i), Proced. & Admin. Regs., states that economic hardship occurs when a taxpayer is "unable to pay his or her reasonable basic living expenses."  Section 301.7122-1(c)(3), Proced. & Admin. Regs., sets forth factors to consider in evaluating whether collection of a tax liability would cause economic hardship, as well as some examples.  One of the examples involves a taxpayer who provides fulltime care to a dependent child with a serious long-term illness.  A second example involves a taxpayer who would lack adequate means to pay his basic living expenses were his only asset to be liquidated.  A third example involves a disabled taxpayer who has a fixed income and a modest home specially equipped to accommodate his disability, and who is unable to borrow against his home because of his disability.  See sec. 301.7122-1(c)(3)(iii), <u>Examples</u> (<u>1</u>), (<u>2</u>), and (<u>3</u>), Proced. & Admin. Regs.  None of these examples bears any resemblance to this case, but instead they "describe more dire circumstances".  <u>Speltz v. Commissioner</u>, 454 F.3d 782, 786 (8th Cir. 2006), affg. 124 T.C. 165 (2005); see also <u>Barnes</u>

v. Commissioner, supra.  Nevertheless, we address petitioners'
arguments.

    1.   Discussion of Special Circumstances in the Notice of
        Determination

Petitioners argue that Ms. Cochran failed "to follow proper
procedure by discussing Petitioners' special circumstances, what
equity was considered in relation to their special circumstances,
and how the special circumstances affected her determination of
their ability to pay."  Petitioners infer that, because the
special circumstances were not discussed in detail in the notice
of determination, Ms. Cochran failed to adequately take their
circumstances into consideration.

We do not believe that Appeals must specifically list in the
notice of determination every single fact that it considered in
arriving at the determination.  See Barnes v. Commissioner,
supra.  This is especially true in a case such as this, where
petitioners provided Ms. Cochran with multiple letters and
hundreds of pages of exhibits.  As discussed below, Ms. Cochran
considered all of the arguments and information presented to her.
Given the amount of information, it would be unreasonable to put
the burden on Ms. Cochran to specifically address in the notice
of determination every single asserted fact, circumstance, and
argument presented.  The fact that all of the information was not
specifically addressed in the notice of determination was not an
abuse of discretion.

2. Petitioners' Income, Assets, and Future Expenses

Petitioners assert that Ms. Cochran erroneously determined their reasonable collection potential by: (1) Considering 77 months of petitioners' future income instead of 48 months; (2) failing to adequately consider their age, health, retirement status, medical costs, and the likelihood of future increases in medical and housing costs; and (3) improperly valuing petitioners' house. Petitioners' arguments are not persuasive.

Section 5.8.5.5 of the IRM provides that, when a taxpayer makes a cash offer to compromise an outstanding tax liability, only 48 months of future income should be considered. Petitioners made a cash offer, but Ms. Cochran used 77 months of future income. At trial, Ms. Cochran acknowledged that she should have used only 48 months of future income. Ms. Cochran recomputed petitioners' reasonable collection potential using 48 months and determined that it was $329,068, instead of $394,318, as reflected in the notice of determination. Ms. Cochran testified that the change would not have had an effect on her final determination because, using either calculation, petitioners' reasonable collection potential was greater than their offer amount ($60,400). We find that Ms. Cochran's error did not amount to an abuse of discretion because, even when the error is corrected, petitioners' reasonable collection potential of $329,068 far exceeds their offer amount of $60,400.

With regard to age, health, and retirement status, petitioners' argument is not supported by the record. In the information submitted to Ms. Cochran, petitioners represented that they were retired and, due to their medical conditions, could not obtain employment. Ms. Cochran did not dispute this. In calculating petitioners' reasonable collection potential, she used only their reported pension income.

Ms. Cochran allowed only $912 of petitioners' reported monthly medical expenses of $1,130. As reflected in the notice of determination, the allowable medical expenses were "based on documentation for out-of-pocket expenses provided by [petitioners] and reflect costs for February 2003 through March 2004 (14 months). The [petitioners'] expenses totaled $12,756, which, divided by 14 months, equals $911.14." While petitioners dispute the reduction of their allowable medical expenses, they have not disputed the accuracy of Ms. Cochran's determination that petitioners' actual documented monthly medical expenses were only $912.

Given her inclusion of pension income as the only source of future income and her acceptance of petitioners' documented medical expenses, we reject petitioners' assertion that Ms. Cochran failed to consider their age, health, retirement status, and current medical costs.

Petitioners' argument is also unavailing with regard to the likelihood of future increases in medical and housing costs. Petitioners did not inform Ms. Cochran with any specificity that they would have to pay a greater amount of unreimbursed medical expenses in the future, or that their housing expenses would increase. Instead, they made general assertions about the increase of medical costs as people age and about the need for some seniors to seek in-home care or nursing home care or to make their houses handicapped accessible.

As reflected in the notice of determination, Ms. Cochran took into consideration the information petitioners presented, but concluded that "these possible future expenses are general projections from the taxpayers' representative and may never, in fact, be incurred. The present offer, therefore, must be considered within the framework of present facts." Given the information presented to her, it was not arbitrary or capricious for Ms. Cochran to ignore these speculative future costs in making her final determination.

Petitioners dispute Ms. Cochran's determination that their house was worth $214,141 instead of $164,713. They argue that, if Ms. Cochran did not agree with their reported value, she should have hired a professional valuation expert instead of making her own determination. Ms. Cochran did not arbitrarily assign a value to petitioners' house, but instead used the value

determined by the Calaveras County Assessor's Office in 2002.  We find that Ms. Cochran's use of the county assessor's valuation was not arbitrary or capricious.

Petitioners raise various other challenges and arguments, including:  (1) Ms. Cochran abused her discretion by taking into consideration only future decreases in expenses and not future increases; (2) Ms. Cochran improperly disallowed petitioners' actual housing and utility expenses; and (3) Ms. Cochran improperly disallowed petitioners' actual transportation expenses.  We need not discuss in detail these and other minor disputes raised by petitioners.  Even assuming arguendo that petitioners' income, expenses, and value of assets should have been accepted as reported, we would not find that Ms. Cochran abused her discretion in rejecting petitioners' offer-in-compromise.  Ms. Cochran testified that, had she accepted the income, expenses, and value of assets as reported, petitioners' reasonable collection potential would have been $178,656. Petitioners offered to pay only $60,400 to compromise their outstanding tax liability.  In some situations, respondent may accept an offer amount of less than petitioners' reasonable collection potential.  However, given all other considerations discussed herein, we do not believe that Ms. Cochran abused her discretion by rejecting an offer-in-compromise that bore no

relationship to petitioners' ability to pay based on their own calculations.

###    3.    Encouraging Voluntary Compliance With the Tax Laws

We are also mindful that any decision by Ms. Cochran to accept petitioners' offer-in-compromise due to doubt as to collectibility with special circumstances or effective tax administration based on economic hardship must be viewed against the backdrop of section 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.[10]  See Barnes v. Commissioner, T.C. Memo. 2006-150.  That section requires that Ms. Cochran deny petitioners' offer-in-compromise if its acceptance would undermine voluntary compliance with tax laws by taxpayers in general.  Thus, even if we were to assume arguendo that petitioners would suffer economic hardship, a finding that we decline to make, we would not find that Ms. Cochran's rejection of petitioners' offer-in-compromise was an abuse of discretion.  As discussed below (in our discussion of petitioners' "equitable facts" argument), we conclude that

---

[10]  The prospect that acceptance of an offer-in-compromise will undermine compliance with the tax laws militates against its acceptance whether the offer-in-compromise is predicated on promotion of effective tax administration or on doubt as to collectibility with special circumstances.  See Rev. Proc. 2003-71, 2003-2 C.B. 517; IRM sec. 5.8.11.2.2; see also Barnes v. Commissioner, T.C. Memo. 2006-150.

acceptance of petitioners' offer-in-compromise would undermine voluntary compliance with tax laws by taxpayers in general.

B.   Public Policy and Equity Considerations

Petitioners assert that "There are so many unique and equitable facts in this case that this case is an exceptional circumstance", and respondent abused his discretion by not accepting those facts as grounds for an offer-in-compromise.  In support of their assertion, petitioners argue:  (1) The longstanding nature of this case justifies acceptance of the offer-in-compromise; (2) respondent's reliance on an example in the IRM was improper; and (3) respondent failed to consider petitioners' other "equitable facts".

1.   Longstanding Case

Petitioners assert that the legislative history requires respondent to resolve "longstanding" cases by forgiving penalties and interest which would otherwise apply.  Petitioners argue that, because this is a longstanding case, respondent abused his discretion by failing to accept their offer-in-compromise.

Petitioners' argument is essentially the same considered and rejected by the Court of Appeals for the Ninth Circuit in Fargo v. Commissioner, 447 F.3d at 711-712.  See also Keller v. Commissioner, T.C. Memo. 2006-166; Barnes v. Commissioner, supra. We reject petitioners' argument for the same reasons stated by the Court of Appeals.  We add that petitioners' counsel

participated in the appeal in <u>Fargo</u> as counsel for the amici.  On brief, petitioners suggests that the Court of Appeals knowingly wrote its opinion in <u>Fargo</u> in such a way as to distinguish that case from the cases of counsel's similarly situated clients (e.g., petitioners), and to otherwise allow those clients' liabilities for penalties and interest to be forgiven.  We do not read the opinion of the Court of Appeals in <u>Fargo</u> to support that conclusion.  See <u>Keller v. Commissioner</u>, <u>supra</u>; <u>Barnes v. Commissioner</u>, <u>supra</u>.

Respondent's rejection of petitioners' longstanding case argument was not arbitrary or capricious.

2.   <u>The IRM Example</u>

Petitioners argue that respondent erred when he determined that they were not entitled to relief based on the second example in IRM section 5.8.11.2.2(3).  Petitioners assert that many of the facts in this case were not present in the example, and, therefore, any reliance on the example was misplaced. Petitioners' argument is not persuasive.

IRM section 5.8.11.2.2(3) discusses effective tax administration offers-in-compromise based on equity and public policy grounds and states in the second example:

> In 1983, the taxpayer invested in a nationally marketed
> partnership which promised the taxpayer tax benefits
> far exceeding the amount of the investment.
> Immediately upon investing, the taxpayer claimed
> investment tax credits that significantly reduced or
> eliminated the tax liabilities for the years 1981

through 1983. In 1984, the IRS opened an audit of the partnership under the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). After issuance of the Final Partnership Administrative Adjustment (FPAA), but prior to any proceedings in Tax Court, the IRS made a global settlement offer in which it offered to concede a substantial portion of the interest and penalties that could be expected to be assessed if the IRS's determinations were upheld by the court. The taxpayer rejected the settlement offer. After several years of litigation, the partnership level proceeding eventually ended in Tax Court decisions upholding the vast majority of the deficiencies asserted in the FPAA on the grounds that the partnership's activities lacked economic substance. The taxpayer has now offered to compromise all the penalties and interest on terms more favorable than those contained in the prior settlement offer, arguing that TEFRA is unfair and that the liabilities accrued in large part due to the actions of the Tax Matters Partner (TMP) during the audit and litigation. Neither the operation of the TEFRA rules nor the TMP's actions on behalf of the taxpayer provide grounds to compromise under the equity provision of paragraph (b)(4)(i)(B) of this section. Compromise on those grounds would undermine the purpose of both the penalty and interest provisions at issue and the consistent settlement principles of TEFRA. * * *

1 Administration, Internal Revenue Manual (CCH), sec.

5.8.11.2.2(3), at 16,378. Ms. Cochran testified that:

I determined that this example was very similar and on point with [petitioners'] case. * * * These were similar years that [petitioners] were associated with. This had to do with a TEFRA proceeding with an FPAA issued with a settlement offer[11] proposed by IRS and subsequently rejected, subsequent litigation. [Petitioners] now offered to compromise all penalties and interest than those contained in the original settlement offer. It involved issues relative to the TMP's actions, and those seemed to be issues--all of

---

[11] The details of the settlement offer are not in the record.

those were issues that, in fact, were being raised
wholly or in part in this case.

We agree with Ms. Cochran that the example presents circumstances similar to those in petitioners' case.

Petitioners are correct in asserting that not all of the facts in their case are present in the example. However, it is unreasonable to expect that facts in an example be identical to facts of a particular case before the example can be relied upon. The IRM example was only one of many factors respondent considered. Given the similarities to petitioners' case, respondent's reliance on that example was not arbitrary or capricious.

### 3. Petitioners' Other "Equitable Facts"

Petitioners argue that respondent abused his discretion by failing to consider the other "equitable facts" of this case. Petitioners' "equitable facts" include reference to: (1) Petitioners' reliance on Bales v. Commissioner, T.C. Memo. 1989-568;[12] (2) petitioners' reliance on Hoyt's enrolled agent status;

---

[12] Bales v. Commissioner, T.C. Memo. 1989-568, involved deficiencies determined against various investors in several Hoyt partnerships. This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes." Taxpayers in many Hoyt-related cases have used Bales as the basis for a reasonable cause defense to accuracy-related penalties. This argument has been uniformly rejected by this Court and by the Courts of Appeals for the Sixth, Ninth, and Tenth Circuits. See, e.g., Hansen v. Commissioner, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; Mortensen v. Commissioner, 440 F.3d 375, 390-391
(continued...)

(3) Hoyt's criminal conviction; (4) Hoyt's fraud on petitioners; and (5) other letters and cases. The basic thrust of petitioners' argument is that they were defrauded by Hoyt and that, if they were held responsible for penalties and interest incurred as a result of their investment in a tax shelter, it would be inequitable and against public policy. Petitioners' argument is not persuasive.

While the regulations do not set forth a specific standard for evaluating an offer-in-compromise based on claims of public policy or equity, the regulations contain two examples. See sec. 301.7122-1(c)(3)(iv), Examples (1) and (2), Proced. & Admin. Regs. The first example describes a taxpayer who is seriously ill and unable to file income tax returns for several years. The second example describes a taxpayer who received erroneous advice from the Commissioner as to the tax effect of the taxpayer's actions. Neither example bears any resemblance to this case. Unlike the exceptional circumstances exemplified in the regulations, petitioners' situation is neither unique nor exceptional in that his situation mirrors those of numerous other taxpayers who claimed tax shelter deductions in the 1980s and

---

[12](...continued)
(6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243, 1254-1256 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

1990s.  See <u>Keller v. Commissioner</u>, T.C. Memo. 2006-166; <u>Barnes v. Commissioner</u>, T.C. Memo. 2006-150.

Of course, the examples in the regulations are not meant to be exhaustive, and petitioners have a more sympathetic case than the taxpayers in <u>Fargo v. Commissioner</u>, 447 F.3d at 714, for whom the Court of Appeals for the Ninth Circuit noted that "no evidence was presented to suggest that Taxpayers were the subject of fraud or deception".  Such considerations, however, have not kept this Court from finding investors in the Hoyt tax shelters to be liable for penalties and interest, nor have they prevented the Courts of Appeals for the Sixth, Ninth, and Tenth Circuits from affirming our decisions to that effect.  See <u>Hansen v. Commissioner</u>, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; <u>Mortensen v. Commissioner</u>, 440 F.3d 375 (6th Cir. 2006), affg. T.C. Memo. 2004-279; <u>Van Scoten v. Commissioner</u>, 439 F.3d 1243 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

Ms. Cochran testified that she considered all of Ms. Merriam's and petitioners' assertions, including the numerous letters and exhibits.  Nevertheless, Ms. Cochran determined that petitioners did not qualify for an offer-in-compromise.

The mere fact that petitioners' "equitable facts" did not persuade respondent to accept their offer-in-compromise does not mean that those assertions were not considered.  The notice of determination and Ms. Cochran's testimony demonstrate

respondent's clear understanding and careful consideration of the facts and circumstances of petitioners' case.  We find that respondent's determination that the "equitable facts" did not justify acceptance of petitioners' offer-in-compromise was not arbitrary or capricious, and thus it was not an abuse of discretion.

We also find that compromising petitioners' case on grounds of public policy or equity would not enhance voluntary compliance by other taxpayers.  A compromise on that basis would place the Government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which they enter.  It would be particularly inappropriate for the Government to play that role here, where the transaction at issue is participation in a tax shelter. Reducing the risks of participating in tax shelters would encourage more taxpayers to run those risks, thus undermining rather than enhancing compliance with the tax laws.  See Barnes v. Commissioner, supra.

C.   Petitioners' Other Arguments

   1.   Compromise of Penalties and Interest in an Effective
        Tax Administration Offer-in-Compromise

Petitioners advance a number of arguments focusing on their assertion that respondent determined that penalties and interest could not be compromised in an effective tax administration

offer-in-compromise. Petitioners argue that such a determination is contrary to legislative history and is therefore an abuse of discretion. These arguments are not persuasive.

The regulations under section 7122 provide that "If the Secretary determines that there are grounds for compromise under this section, the Secretary may, at the Secretary's discretion, compromise any civil * * * liability arising under the internal revenue laws". Sec. 301.7122-1(a)(1), Proced. & Admin. Regs. In other words, the Secretary may compromise a taxpayer's tax liability if he determines that grounds for a compromise exist. If the Secretary determines that grounds do not exist, the amount offered (or the way in which the offer is calculated) need not be considered.

Petitioners' arguments regarding the compromise of penalties and interest do not relate to whether there are grounds for a compromise. Instead, these arguments go to whether the amount petitioners offered to compromise their tax liability was acceptable. As addressed above, respondent's determination that the facts and circumstances of petitioners' case did not warrant acceptance of their offer-in-compromise was not arbitrary or capricious and was thus not an abuse of discretion. Because no grounds for compromise exist, we need not address whether respondent can or should compromise penalties and interest in an

effective tax administration offer-in-compromise.  See <u>Keller v. Commissioner</u>, <u>supra</u>.

### 2. Information Sufficient for the Court To Review Respondent's Determination

Petitioners argue that respondent failed to provide the Court with sufficient information "so that this Court can conduct a thorough, probing, and in-depth review of respondent's determinations."  Petitioners' argument is without merit.

Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect.  Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).[13]  The burden was on petitioners to show that respondent abused his discretion.  The burden was not on respondent to provide enough information to show that he did not abuse his discretion.  Nevertheless, we find that we had more than sufficient information to review respondent's determination.

### 3. Deadline for Submission of Information

Petitioners argue that Ms. Cochran abused her discretion by not allowing their counsel additional time to submit information

---

[13]  While sec. 7491 shifts the burden of proof and/or the burden of production to the Commissioner in certain circumstances, this section is not applicable in this case because respondent's examination of petitioners' returns did not commence after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

to be considered.  Petitioners argument is not supported by the record.

Petitioners assert that they were "initially only given weeks" to provide all information.  However, they ignore the fact that Ms. Cochran granted their requested extension and allowed them until April 9, 2004 to submit information.  Additionally, petitioners have not identified any documents or other information that they believe Ms. Cochran should have considered but that they were unable to produce because of the deadline for submission.  Given the thoroughness and the amount of information submitted, it is unclear why petitioners needed additional time.  We do not believe that Ms. Cochran abused her discretion by establishing a deadline for the submission of information.

4.  <u>Efficient Collection Versus Intrusiveness</u>

Petitioners argue that respondent failed to balance the need for efficient collection of taxes with the legitimate concern that the collection action be no more intrusive than necessary.  See sec. 6330(c)(3)(C).  Petitioners' argument is not supported by the record.

Petitioners have an outstanding tax liability.  In their section 6330 hearing, petitioners proposed only an offer-in-compromise.  Because no other collection alternatives were proposed, there were not less intrusive means for respondent to consider.  We find that respondent balanced the need for

efficient collection of taxes with petitioners' legitimate concern that collection be no more intrusive than necessary.

D.   Conclusion

Petitioners have not shown that respondent's determination was arbitrary or capricious, or without sound basis in fact or law.  For all of the above reasons, we hold that respondent's determination was not an abuse of discretion, and respondent may proceed with the proposed collection action.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be

entered for respondent.