T.C. Memo. 2008-6

UNITED STATES TAX COURT

ROBERT AND GRACE BERGEVIN, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6678-06L.                    Filed January 14, 2008.

<u>Terri Ann Merriam</u>, <u>Jaret R. Coles</u>, <u>Brian Gary Isaacson</u>, and <u>Marlyn P. Chu</u>, for petitioners.

<u>Gregory M. Hahn</u> and <u>Danae M. Rawson</u>, for respondent.


MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This proceeding was commenced in response to a Notice of Determination Concerning Collection Action Under Section 6330 sent to each petitioner with respect to their income tax liabilities for 1981, 1982, 1983, 1984, and 1986.  Unless

otherwise indicated, all section references are to the Internal Revenue Code, as amended.

The liabilities arose out of petitioners' participation in a so-called Hoyt cattle venture.  Petitioners acknowledge that this case is similar to at least 16 other cases involving Hoyt cattle breeding partnerships that are currently on appeal to the Court of Appeals for the Ninth Circuit, including Ertz v. Commissioner, T.C. Memo. 2007-15.  Petitioners offered to stipulate to be bound by the outcome of the Ertz case or, in the alternative, petitioners requested that this case be continued pending action by the Court of Appeals in Ertz and the cases consolidated with it on appeal.  Respondent declined the stipulation to be bound and objected to the continuance.

This case has certain "procedural" differences from Ertz and the other cases.  Petitioners resided in Minnesota at the time that their petition was filed, and, absent stipulation to the contrary, our decision in this case is not appealable to the Court of Appeals for the Ninth Circuit.  Also, unlike the other cases, there is no section 6621(c) issue in this case, so that the jurisdictional question raised in Ertz is not involved in this case.  Third, the administrative record in this case was lost and has been recreated by respondent.  Thus, testimony of the Appeals officer who conducted the hearing under section 6330 was taken, notwithstanding respondent's objection that review

should be limited to the administrative record under the Court of Appeals opinion in Robinette v. Commissioner, 439 F.3d 455 (8th Cir. 2006), revg. 123 T.C. 85 (2004). In view of the years for which the interest on the underlying liabilities is accruing, we have decided to proceed with our opinion in this case. The issue for decision is whether it was an abuse of discretion to refuse petitioners' offer-in-compromise and to determine that collection efforts should proceed.

## Background

Although the record is voluminous, we do not here recount in detail the background of the Hoyt partnerships; that has been restated many times. We simply outline those facts necessary to an understanding of petitioners' arguments to the settlement officer who conducted the section 6330 hearing and to the Court.

### Walter J. Hoyt III (Hoyt or Jay Hoyt)

Many facts and documents have been stipulated in six separate stipulations filed in this case, which are incorporated in our findings by this reference. Background facts concerning the venture in which petitioners invested are described in "narrative stipulations" relating to Hoyt. From about 1971 through 1998, Hoyt organized and promoted to thousands of investors more than 100 cattle breeding partnerships and some sheep partnerships. The partnerships were all organized and operated in essentially the same manner. In addition, all of the

Hoyt organization investor partnerships were marketed and promoted in an identical fashion. As the general partner managing each partnership, Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return. Hoyt used his status as an enrolled agent with the Internal Revenue Service (IRS) to promote the partnerships.

The Hoyt partnerships were ultimately audited as "a tax shelter project". Most of the partnerships were audited under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, section 402(a), 96 Stat. 648. See secs. 6221-6231. Hoyt acted as the tax matters partner (TMP) during the audit and until his removal by this Court in certain cases, commencing in 2000.

On or around April 23, 1984, a criminal investigation reference concerning Hoyt was made. On April 21, 1986, a recommendation for prosecution was made. Those recommendations, however, did not lead to prosecution. On or about July 28, 1989, a second reference for criminal investigation was made. In 1990, a grand jury investigation of Hoyt concluded without an indictment. Hoyt's status as an enrolled agent was revoked in 1998.

A criminal indictment was filed on June 2, 1999, and Hoyt was convicted of various criminal charges on February 12, 2001.

The criminal charges included fraud, mail fraud, bankruptcy fraud, and money laundering. The essence of the criminal charges was that Hoyt had victimized approximately 4,000 investors, including petitioners.

Petitioners

On their income tax returns beginning in 1984, petitioners claimed losses and credits from their involvement in a cattle investor partnership organized and operated by Hoyt and identified as Shorthorn Genetic Engineering 1984-4 Ltd. Petitioners also claimed that losses related to the Hoyt partnership carried back to 1981, 1982, and 1983. Additional deductions were claimed on petitioners' returns for 1985 and 1986. As a result of delays caused by Hoyt's dealings with the IRS and the various investigations of Hoyt, the taxes for the years in issue were not assessed until sometime in 1998.

Section 6330 Proceedings

On March 21, 2005, the IRS sent to each petitioner a separate Final Notice--Notice Of Intent To Levy And Notice Of Your Right To A Hearing for each of the years 1981, 1982, 1983, 1984, and 1986. A Request for a Collection Due Process Hearing was filed on behalf of petitioners on or about April 7, 2005.

Petitioners' request for a section 6330 hearing included the following arguments:

> Mr. and Mrs. Bergevin believe that the Notice of Intent
> to Levy is improper for the following reasons:

1.  The Equitable Provisions of RRA 1998 Concerning
    Offers in Compromise

The Conference Report of RRA 1998 directs that "the IRS
[in formulating these rules] take into account factors
such as equity, hardship, and public policy where a
compromise of an individual taxpayer's income tax
liability would promote effective tax administration."
H. Conf. Rep. No. 599, 105th Cong., 2d Sess. 289
(1998).  The legislative history also specifies that
the IRS should utilize this new authority "to resolve
longstanding cases by forgoing penalties and interest
which have accumulated as a result of delay in
determining the taxpayer's liability."  Id.  The Hoyt
partnership cases clearly qualify as "longstanding"
cases and interest should be abated in an offer in
compromise.  The Commissioner's current position on
these cases, to abate no interest because the IRS does
not believe it contributed to the delay, is
inconsistent with the broad legislative intent to go
outside the narrow constraints of interest abatement
under 26 U.S.C. sec. 6404(e) and simply abate interest
in longstanding cases.

Furthermore, it has been established by Jay Hoyt's
March 2001 conviction that he defrauded the partners
and that the partners were his unwitting victims.  (The
I.R.S. also determined that the partners were
"unwitting victims" in his appeals supporting statement
concerning the TEFRA cases).  Thus, application of RRA
1998's equitable provisions should take into account
the extraordinary circumstances of these victims.  The
IRS' refusal to consider the equities of these cases is
inconsistent with legislative intent.

Therefore, the collection alternative of an "effective
tax administration" offer should be considered.

         *    *    *    *    *    *    *

3.  Opportunity to be Heard

Mr. and Mrs. Bergevin had no opportunity to be heard
during the examination process.  Jay Hoyt, the TMP, was
under criminal investigation by the IRS during the
examination process and was subject to impermissible
conflicts of interests due to that investigation that
rendered him incapable of performing his fiduciary

duties to Mr. and Mrs. Bergevin.  During that same time period, Jay Hoyt was also under tax return preparer penalty investigation by the IRS, which also contributed to his conflicts of interest and his inability to represent Mr. and Mrs. Bergevin. Notwithstanding the effect of IRS investigations on the TMP's fiduciary duties to the partners, the IRS determined in 1989 that a number of circumstances caused Jay Hoyt to have debilitating conflicts of interest and that he, in fact, breached his fiduciary duty to the partners.  For example, Mr. Hoyt apparently did not raise questions concerning the treatment of guarantee payments to the investors, when those payments were not paid to the investors but credited as IRA payments that were later disallowed by the IRS. However, to raise this issue, Hoyt would have to admit to his fraudulent actions concerning the IRA plan, which of course he did not.  The effect of Hoyt's conflicts of interest on the tax assessments ultimately suffered by his victims should be considered under the expanded RRA 1998 equity provisions.

4.   Offer in Compromise or Other Collection Alternative

Mr. and Mrs. Bergevin will not be able to pay the full Hoyt liability, which is currently estimated to be approximately $130,000, which amount includes both the assessed years 1981 through 1986[1] and the unassessed years 1987 through 1996.  The entire liability should be considered when determining Mr. and Mrs. Bergevin's ability to pay.  Consideration should also be give [sic] to the financial hardship payment will cause when Mr. and Mrs. Bergevin retire.  See Code sec. 7122(c)(1) as added by section 3462(a) of RRA 1998 (Public Law No. 105-206).  Any tax payment by the Bergevins will significantly impact their ability to provide for necessary living expenses during retirement.  In the Conference Report of RRA 1998, Congress expressed its intent "that the IRS [in formulating these rules] take into account factors such as equity, hardship, and public policy where a compromise of an individual taxpayer's income tax liability would promote effective tax administration."  H. Conf. Rep. 599, 105th Cong., 2d Sess 289 (1998).  We are currently in process of updating Mr. and Mrs. Bergevin's financial information

and an updated Form 433-A Financial Statement will be provided upon request.

_____

[1] 1985 has been assessed but has not been included in the group of Notices to Intent to Levy dated March 21, 2005.

Petitioners' financial information provided on Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, listed two checking accounts with a total balance of $1,186; two investment accounts totaling $44,051; and two automobiles.  They listed their residence as valued at $131,440, with an outstanding loan of $93,000.  Petitioners' income and expenses were shown as follows:

### Total Monthly Income

| Source | Gross Monthly |
| --- | --- |
| Wages (Robert Bergevin) | $2,750 |
| Wages (Grace Bergevin) | 635 |
| Pension/Social Security (Robert Bergevin) | 909 |
| Pension/Social Security (Grace Bergevin) | 1,483 |
| Other | 363 |
| Total | 6,140 |

### Total Monthly Living Expenses

| Expense Items | Actual Monthly |
| --- | --- |
| Food, clothing, and misc. | $1,280 |
| Housing and utilities | 1,138 |
| Transportation | 1,210 |
| Health care | 391 |
| Taxes (income and FICA) | 637 |
| Other expenses | 545 |
| Total | 5,201 |

After the exchange of financial information, petitioners proposed to pay $20,652 in full satisfaction of their then

estimated $130,000 liability.  The settlement officer explained

his methodology as follows:

> As I indicated in my previous letter, administrative
> guidance found in Internal Revenue Manual ("IRM") sec.
> 5.8.11.2.2(10) specifically states that:
>
>> The Service will not compromise on public policy
>> or equity grounds based solely on the argument
>> that the acts of a third party caused the unpaid
>> tax liability.
>
> The regulations in 26 C.F.R sec. 301.7122-1(b)(3)(iii)
> preclude settlement if compromise would undermine the
> general public's compliance with our nation's tax laws.
> IRS has taken this stance with respect to settlement of
> TEFRA matters such as your[s].  IRM sec. 5.8.11.2.2(3)
> provides an example that resembles your case.  The
> existing administrative policies and procedures simply
> preclude me from being able to secure the necessary
> approvals of a non-hardship Effective Tax
> Administration ("ETA") offer in your case.  I am not,
> however, precluded from considering the merits of your
> case under standard doubt as to collectibility or ETA
> hardship criteria.
>
> For an offer in compromise based upon doubt as to
> collectibility to be accepted, you must generally offer
> an amount that meets or exceeds <u>reasonable collection
> potential</u> ("RCP").  RCP has two primary components:
>
> 1.  Net realizable equity in assets, and
>
> 2.  The present value of your future ability to
>     pay toward the tax debt
>
> Net realizable equity in assets is simply the
> difference between the quick sale values (generally
> 80 percent of fair market values) of your assets minus
> the amounts owed on the interests and encumbrances
> having priority over the federal tax liens.  The
> present value of your future income is determined by
> subtracting necessary living expenses (those necessary
> for your health, welfare and the production of income)
> from your monthly income.  For Appeals to accept your
> offer under ETA hardship provisions, you must be able
> to demonstrate that payment of more than $20,652 would

cause you to be unable to meet your necessary living expenses.

Petitioners raised some objections to the settlement officer's initial computations.  The settlement officer made some adjustments in response to information submitted.  The settlement officer reduced petitioners' projected monthly net income and recomputed the collection potential as follows:

ASSET/EQUITY TABLE
(AET)

BERGEVIN

Revised Jan. 31, 2006

| Asset | Fair Market Value (FMV) Determination | Quick Sale Value (QSV) Determination | Encumbrance or Exemption Determination | Net Realizable Equity Determination |
|---|---|---|---|---|
| Cash | 0 | 0 | 0 | 0 |
| Checking acct. | $1,347 | $1,347 | 0 | $1,347 |
| Checking acct.-2 | 262 | 262 | 0 | 262 |
| Savings acct. | 25 | 25 | 0 | 25 |
| 401(k) | 69,500 | 69,500 | $24,325 | 45,175 |
| 401(k)-2 | 317 | 317 | 0 | 317 |
| Loan value of life ins. | 0 | 0 | 0 | 0 |
| Stocks, bonds, mutual funds | 0 | 0 | 0 | 0 |
| Pension | 0 | 0 | 0 | 0 |
| Personal residence | 181,200 | 144,960 | 94,500 | 50,460 |
| Dissipation of assets | 15,000-50,000 | 15,000-50,000 | 0 | 15,000-50,000 |
| Other real estate | 0 | 0 | 0 | 0 |
| Furniture/ personal effects | < 7,200 | < 7,200 | 7,200 | 0 |
| Vehicle 1-1995 Saturn SL1 83,000 miles | 1,000 | 800 | 0 | 800 |
| Vehicle 2-2002 Toyota Camry 50,000 miles | 11,000 | 8,800 | 6,855 | 1,945 |
| Accts. receivable | 0 | 0 | 0 | 0 |
| Tools/equip. of trade | < 3,600 | < 3,600 | 3,600 | 0 |

| | |
|---|---|
| Total Net Realizable Equity in Assets | $115,331-$150,331 |
| Present Value of Future Income (from the IET) | Cash Offer - $28,032 |
| TOTAL MINIMUM OFFER (absent exceptional circumstances) (absent exceptional circumstances) | Cash Offer - $143,363-$178,363 |
| Total Tax Liability (as of 2/15/2006) | $150,000 (POA's estimate) |

IRC 6334(a)(2) allows for an exemption of $7,200 for fuel, provisions, furniture, and personal effects.
IRC 6334(a)(3) allows for an exemption of $3,600 for books and tools of a trade, business, or profession.

REMARKS:
* The $1,347 value assigned to the checking acct. is the average minimum balance as reflected on the June, July, and Aug. 2005 bank statements.
* The $69,500 value for the 401(k) acct. based on the 9/30/05 statement. An estimated 35 percent tax implication is assigned to this 401(k) acct. because it is being used to fund the offer.
* The $181,200 value for the Personal Residence is the Estimated Market Value as determined by the Anoka County Assessor and reflected on the 2005 Property Acct. Statement.
* The Private Party Value of the 2002 Camry is $11,000. Trade-in Value is not used because the FMV is reduced by 20 percent to arrive at a forced-sale value.
* $15,000-$50,000 dissipation of assets assigned to the portion of the Home Equity Line of Credit used to fund payment of unsecured credit cards debts and non-necessary living expenses such as sprinkler.

Petitioners' primary arguments were that, at 71 and 70 years of age, they were approaching retirement age; Mr. Bergevin had special health problems; and, after retirement, they would have negative cashflow. Petitioners presented projections claiming that they would need to retain most of their asset equity to meet their ordinary and necessary living expenses over the following 5 years. The settlement officer responded in part:

> The Bergevin Asset Equity Calculator presented by your representative's firm, though an illustration commonly presented as a contention in an Effective Tax Administration offer, is non-persuasive. It's based on the erroneous premise that the Internal Revenue Service is charged with making certain taxpayers have sufficient assets to fund future living expenses. To agree with this assumption is to conclude that absent independent wealth no one over the age of 60 should have to pay any federal tax because he/she will need such funds for future retirement living expenses. Congress has made no such exception and IRS, as the revenue collecting arm of the United States, has no role in such a social issue. General offer guidelines require the IRS examiner to make a reasonable determination as to necessary living expenses and Effective Tax Administration guidelines further require the examiner to make a reasonable determination as to future living expenses within the overall context of settlement, but the examiner is not required to ensure the existence level presented by your representative at the practical disregard for the tax debt. The examples in Internal Revenue Manual 5.8.11 in no way present such a requirement.
>
> The taxpayers are each of retirement age. If one or both retire, their household income would decrease along with the expense allowances for Taxes and Transportation. Health Care expenses would likely increase. The IRM allows a continuing Transportation Operating expense of $200 once the loan on the 2002 Toyota Camry is paid. Because of the uncertainties and complexities involved in this case, I used a PV factor of 24 (months) instead of the standard 48 (months) in

determining the present value of the Bergevins' future ability to pay. This was done in accordance with IRM 5.8.5.5.

During the course of the negotiations through exchange of documents and meetings between petitioners' counsel and the settlement officer, other issues were discussed. The parties disagreed as to the effect of a decision entered February 9, 2005, in an abatement action brought by petitioners in this Court. The decision provided that, with respect to the tax years 1984, 1985, and 1986, petitioners are not entitled to an abatement of interest under section 6404.

In the notices of determination sent March 3, 2006, the offer-in-compromise was rejected as follows:

Offers of Collection Alternatives

We considered your offer of $20,652 dated September 27, 2005 and were not able to accept the offer under existing policies and procedures. * * * [Settlement Officer Dale Veer] previously provided you with the details of how this determination was made.

You were given the opportunity to amend your offer to an amount not less than the current balance owed for years 1981, 1982, 1983, 1984, 1985 and 1986. You were also offered the opportunity to either pay the 1981-1986 balances in full or present an alternative proposal to the offer in compromise. You neglected all such opportunities.

## Discussion

Petitioners invoke our jurisdiction under section 6330(d) to review the notices of determination sent to them with respect to the proposed levies on their property. Petitioners contend that

refusal to accept their offer-in-compromise was an abuse of discretion because of their "special circumstances" of age and health and postretirement anticipated earnings; that the offer-in-compromise should have been accepted because factors such as equity, hardship, and public policy warrant its acceptance to promote effective tax administration; that the Commissioner failed to establish sufficient guidelines for resolving longstanding cases by such means as forgoing penalties and interest that have accumulated as a result of delay in determining the taxpayers' liability; and that interest abatement should have been considered during the section 6330 hearing.

Respondent contends that the offer-in-compromise petitioners made was inadequate in view of their financial circumstances analyzed by the settlement officer; that petitioners' situation is neither unique nor exceptional; that effective tax administration would not be served by acceptance of the low offer-in-compromise because it would undermine compliance by other taxpayers; that some of the interest on petitioners' liabilities had been abated (for 1981, 1982, and 1983); and that petitioners' abatement arguments relate only to the total amount of the liability to be compromised.

Although the record includes six stipulations and over 400 exhibits, the parties agree that the overriding issues in this case are indistinguishable from issues discussed in other cases,

some of which are on appeal.  Those issues relate to the effect

of Hoyt's fraud and the years of delay in resolving tax

liabilities of his investors.  In addition, petitioners argue:

> the other issues that are substantially the same or
> identical are how to treat * * * elderly and retired
> individuals.  Does Respondent need to make some--does
> Respondent need to estimate their basic needs for their
> life span?  That is probably the overreaching [sic]
> issue in a number of the cases where we have elderly
> and retired individuals.  So an answer to that would
> probably answer this case as well.

Respondent has objected to some of the exhibits on the

grounds of hearsay and to others on the grounds that they are not

relevant because they were not presented to the Appeals officer

during the exchanges that constituted the section 6330 hearing.

See Robinette v. Commissioner, 439 F.3d 455 (8th Cir. 2006);

Murphy v. Commissioner, 125 T.C. 301 (2005), affd. 469 F.3d 27

(1st Cir. 2006); Magana v. Commissioner, 118 T.C. 488, 493

(2002).  We sustain the objections because, even if the exhibits

are considered for nonhearsay purposes and are relevant, they

constitute needless presentation of cumulative evidence.  See

Fed. R. Evid. 403.

Section 7122(c) and (d) provides as follows:

> SEC. 7122(c).  Standards for Evaluation of
> Offers.--
>
> (1) In general.--The Secretary shall
> prescribe guidelines for officers and employees of
> the Internal Revenue Service to determine whether
> an offer-in-compromise is adequate and should be
> accepted to resolve a dispute.

(2) Allowances for basic living expenses.--

(A) In general.--In prescribing guidelines under paragraph (1), the Secretary shall develop and publish schedules of national and local allowances designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses.

(B) Use of schedules.--The guidelines shall provide that officers and employees of the Internal Revenue Service shall determine, on the basis of the facts and circumstances of each taxpayer, whether the use of the schedules published under subparagraph (A) is appropriate and shall not use the schedules to the extent such use would result in the taxpayer not having adequate means to provide for basic living expenses.

(3) Special rules relating to treatment of offers.--The guidelines under paragraph (1) shall provide that--

(A) an officer or employee of the Internal Revenue Service shall not reject an offer-in-compromise from a low-income taxpayer solely on the basis of the amount of the offer; and

(B) in the case of an offer-in-compromise which relates only to issues of liability of the taxpayer--

(i) such offer shall not be rejected solely because the Secretary is unable to locate the taxpayer's return or return information for verification of such liability; and

(ii) the taxpayer shall not be required to provide a financial statement.

(d) Administrative Review.--The Secretary shall establish procedures--

(1) for an independent administrative review of any rejection of a proposed offer-in-compromise or installment agreement made by a taxpayer under this section or section 6159 before such rejection is communicated to the taxpayer; and

(2) which allow a taxpayer to appeal any rejection of such offer or agreement to the Internal Revenue Service Office of Appeals.

Regulations adopted pursuant to section 7122 set forth three grounds for the compromise of a liability: (1) Doubt as to liability; (2) doubt as to collectibility; or (3) promotion of effective tax administration. Sec. 301.7122-1, Proced. & Admin. Regs. With respect to the third ground, paragraph (b)(3)(i) of the regulation allows for a compromise to be entered into to promote effective tax administration where collection in full could be achieved but would cause economic hardship. Paragraph (c)(3)(i) sets forth factors that would support (but are not conclusive of) a finding of economic hardship. With respect to the third ground, those regulations state:

(3) Compromises to promote effective tax administration.--(i) Factors supporting (but not conclusive of) a determination that collection would cause economic hardship within the meaning of paragraph (b)(3)(i) of this section include, but are not limited to--

(A) Taxpayer is incapable of earning a living because of a long term illness, medical condition, or disability, and it is reasonably foreseeable that taxpayer's financial resources will be exhausted providing for care and support during the course of the condition;

(B) Although taxpayer has certain monthly income, that income is exhausted each month in

providing for the care of dependents with no other means of support; and

(C) Although taxpayer has certain assets, the taxpayer is unable to borrow against the equity in those assets and liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses.

The regulation states that no compromise may be entered into if such compromise of liability would undermine compliance by taxpayers with the tax laws. Sec. 301.7122-1(b)(3)(iii), Proced. & Admin. Regs. Paragraph (c)(3)(ii) then sets forth factors that support (but are not conclusive of) a determination that a compromise would undermine compliance with the tax laws. These factors include: (A) A taxpayer who has a history of noncompliance with the filing and payment requirements of the Internal Revenue Code; (B) a taxpayer who has taken deliberate action to avoid the payment of taxes; and (C) a taxpayer who has encouraged others to refuse to comply with the tax laws. Sec. 301.7122-1(c)(3)(ii), Proced. & Admin. Regs. The regulation continues:

(iii) The following examples illustrate the types of cases that may be compromised by the Secretary, at the Secretary's discretion, under the economic hardship provisions of paragraph (b)(3)(i) of this section:

Example 1. The taxpayer has assets sufficient to satisfy the tax liability. The taxpayer provides full time care and assistance to her dependent child, who has a serious long-term illness. It is expected that the taxpayer will need to use the equity in his assets to provide for adequate basic living expenses and medical care for his child. The taxpayer's overall compliance history does not weigh against compromise.

Example 2. The taxpayer is retired and his only income is from a pension. The taxpayer's only asset is a retirement account, and the funds in the account are sufficient to satisfy the liability. Liquidation of the retirement account would leave the taxpayer without an adequate means to provide for basic living expenses. The taxpayer's overall compliance history does not weigh against compromise.

Example 3. The taxpayer is disabled and lives on a fixed income that will not, after allowance of basic living expenses, permit full payment of his liability under an installment agreement. The taxpayer also owns a modest house that has been specially equipped to accommodate his disability. The taxpayer's equity in the house is sufficient to permit payment of the liability he owes. However, because of his disability and limited earning potential, the taxpayer is unable to obtain a mortgage or otherwise borrow against this equity. In addition, because the taxpayer's home has been specially equipped to accommodate his disability, forced sale of the taxpayer's residence would create severe adverse consequences for the taxpayer. The taxpayer's overall compliance history does not weigh against compromise.

Under the regulations, a compromise may also be entered into to promote efficient tax administration if there are compelling public policy or equity considerations identified by the taxpayer. Compromise is justified where, because of exceptional circumstances, collection of the full liability would undermine public confidence that tax laws are being administered fairly. Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs. Some examples where a compromise is allowed for purposes of public policy and equity are: (1) A taxpayer who was hospitalized regularly for a number of years and was unable, at that time, to manage his financial affairs and (2) a taxpayer learns at audit that he was

given erroneous advice and is facing additional taxes, penalties, and additions to tax. Sec. 301.7122-1(c)(3)(iv), Proced. & Admin. Regs. In addition to the regulations, detailed instructions concerning offers-in-compromise are contained in the Internal Revenue Manual. 1 Administration, Internal Revenue Manual (CCH), pt. 5.8, at 16251.

Notwithstanding minor disputes about the computation of collection potential by the settlement officer, petitioners have not shown that payment of more than the amount that they offered in settlement of their liabilities would render them unable to meet basic living expenses. Their projections of future expenses are speculative and unpersuasive. Petitioners' situation is not comparable to the examples given in the regulations. In any event, the settlement officer thoroughly considered and addressed their arguments.

Except for the specifics of the financial information, this case is indistinguishable from the other cases decided by this Court in which we held that it was not an abuse of discretion to reject the taxpayers' offer to compromise their outstanding liabilities relating to the Hoyt investments at a fraction of the total liabilities. See Smith v. Commissioner, T.C. Memo. 2007-73; Hansen v. Commissioner, T.C. Memo. 2007-56; Catlow v. Commissioner, T.C. Memo. 2007-47; Estate of Andrews v. Commissioner, T.C. Memo. 2007-30; Johnson v. Commissioner, T.C.

Memo. 2007-29; <u>Freeman v. Commissioner</u>, T.C. Memo. 2007-28;

<u>Hubbart v. Commissioner</u>, T.C. Memo. 2007-26; <u>Carter v.</u>

<u>Commissioner</u>, T.C. Memo. 2007-25; <u>Abelein v. Commissioner</u>, T.C.

Memo. 2007-24; <u>Ertz v. Commissioner</u>, T.C. Memo. 2007-15;

<u>McDonough v. Commissioner</u>, T.C. Memo. 2006-234; <u>Lindley v.</u>

<u>Commissioner</u>, T.C. Memo. 2006-229; <u>Clayton v. Commissioner</u>, T.C.

Memo. 2006-188; <u>Keller v. Commissioner</u>, T.C. Memo. 2006-166;

<u>Barnes v. Commissioner</u>, T.C. Memo. 2006-150.

All of the arguments made by petitioners were thoroughly discussed in <u>Ertz v. Commissioner</u>, <u>supra</u>.  As in the other cases, petitioners' arguments were considered by the settlement officer, although the arguments were not accepted.  As we stated in <u>Ertz</u>:

> compromising petitioner's case on grounds of public policy or equity would not enhance voluntary compliance by other taxpayers.  A compromise on that basis would place the Government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which they enter.  It would be particularly inappropriate for the Government to play that role here, where the transaction at issue is participation in a tax shelter. Reducing the risks of participating in tax shelters would encourage more taxpayers to run those risks, thus undermining rather than enhancing compliance with the tax laws.  See <u>Barnes v. Commissioner</u>, <u>supra</u> [T.C. Memo. 2006-150].

In concluding that it was not an abuse of discretion to accept the offer-in-compromise at less than 20 percent of petitioners' estimated total liability, we do not determine an acceptable offer-in-compromise or other alternative means of

collection.  The only issue before us is whether there was an abuse of discretion in refusing the offer that petitioners made.  See Speltz v. Commissioner, 124 T.C. 165, 180 (2005), affd. 454 F.3d 782 (8th Cir. 2006).  The settlement officer adequately considered the arguments and made a reasoned determination.  We hold that there was no abuse of discretion in that process.

Decision will be entered

for respondent.